## TRICO PRODUCTS CORPORATION v. E. A. LABORATORIES.

### No. 5411.

District Court, E. D. New York.

Sept. 9, 1932.

See, also, 49 F.(2d) 404.

George T. Bean, of New York City (Barton A. Bean, Jr., and Edwin T. Bean, both of Buffalo, N. Y., of counsel), for plaintiff.

Duell, Dunn & Anderson, of New York City (Holland S. Duell, of New York City, and David S. Kane, of Far Rockaway, N. Y., of counsel), for defendant.

CAMPBELL, District Judge.

This is a patent suit in which plaintiff claims infringement of claims 1, 2, 3, and 4 of patent No. 1,434,655, issued to Walter A. Garratt, for sounding device, dated November 7, 1922, on application filed November 26, 1919; and of claim 4 of patent No. 1,391,887, issued to Walter A. Garratt, for pneumatic horn, dated September 27, 1921, on application filed January 30, 1920.

The bill of complaint also alleged infringement by the defendant of patent No. 1,434,657, issued to Walter A. Garratt, but that patent was withdrawn from this action on the trial, and therefore the plaintiff rests this action on the two patents above described.

The defendant has by answer interposed the defenses of invalidity and noninfringement.

The plaintiff has title to the two patents in suit.

The plaintiff has been, since its incorporation in 1918, engaged principally in the manufacture of vacuum windshield wipers, and has built up a very large business.

The first warning signal it has put on the market is the present "Trico Clarion Horn," which it introduced in November, 1930, and realizing the inoperativeness of this horn under certain conditions, plaintiff has provided an automatic transfer which causes the electric horn carried by the car as standard equipment to sound if the vacuum horn should fail to do so.

The defendant and its predecessor in business, the Automobile Supply Manufacturing Company, has been, since 1903, continuously engaged in manufacturing automobile horns, and has built up a very large business.

The defendant's horn, which is charged herein as being an infringement, exemplified by Plaintiff's Exhibits 4 and 5, is a vacuum operated novelty or fashion type of horn, sold under the trade name of "E. A. Supertone Horn."

No manufacturer of automobiles has adopted the vacuum operated horn as standard equipment. Vacuum operated horns are inherently inoperative when used in connection with vacuums obtainable in certain motors, when traveling at high speed.

The "E. A. Supertone Horn" represents only 2 per cent. or 3 per cent. of the defendant's total horn production.

There is a similarity in the operation and tonal qualities of the "E. A. Supertone Horn" of defendant and the "Trico Clarion Horn" of the plaintiff, the tone being loud, penetrating, and musical in character, and may be heard at a substantial distance.

This is not true of the horn of the patents in suit, in both of which the patentee intended sound to be produced by the striking of one member against the other, independent of the sound resulting in the rapid interruptions of the air current, and so specifies in the specifications; and after hearing the sounds produced by Defendant's Exhibits K and L, I agree with the statement of the patentee in his specification in the patent in suit, No. 1,391,887:

"The sound produced by this mechanism is of a peculiarly penetrating and disagreeable character, and acts as a startling warning when used in connection with a motor vehicle."

The parties to this suit are, respectively, the owners of other patents which cover specifically the commercial structure of their respective horns; in fact, the plaintiff's own horn is alleged to be covered by only a single claim of one of the patents in suit, and defendant contests that allegation.

It therefore follows that commercial success has not been shown for the patents in suit, as the only horns built in accordance with the drawings and specifications of the patents in suit, except models constructed by the defendant for use on, and offered as, exhibits on this trial, samples submitted to de-

fendant by the patentee at the time he offered the patent for sale, which could not be made to operate so as to give a suitable sound for warning purposes, and a few other models made by the patentee but not produced by plaintiff at the trial.

The patentee offered these patents for sale to the defendant in 1927, but the defendant, after careful investigation, refused to purchase them because of what it considered the inoperativeness of the structure disclosed.

They were subsequently purchased by plaintiff.

The attempt of the plaintiff to show that defendant was guilty of copyist tactics at the Cleveland show, in November, 1930, failed, as I believe the testimony of the witness Toepel, who was in charge of the defendant's exhibit at that show and swears that he set up the exhibit, and that there were exhibited Supertone vacuum operated horns, and that he explained to people referred to him by the salesmen, that it was a vacuum operated horn, and the purposes of such horns.

He is corroborated by the photograph which he caused to be taken of defendant's exhibit at that show.

The patents in suit cover a horn or warning signal operated by the vacuum obtainable from the intake manifold of an automobile engine, and is briefly described as follows:

A chamber is provided, one wall of which is formed of a flexible diaphragm having a central aperture. Co-operating with this aperture and normally sealing the same is a closure member. When vacuum is applied to the chamber, the atmospheric pressure on the other side of the diaphragm forces it away from the closure, allowing air to rush through the diaphragm aperture into the chamber, thus bringing about an equalization of pressure.

When this occurs, the diaphragm springs back to place, due to its own resiliency, once more effecting a seal with the closure, and allowing the cycle to be reinitiated. It is the rapid opening and closing of the valve, with the accompanying hammering of the diaphragm against the closure, that Garratt depends upon for the production of sound.

The defendant offered in evidence a number of prior art patents and a publication.

These may be most conveniently considered in groups, as they were by the defendant's expert.

The pneumatic sounding device art found its origin in the old reed, illustrated by organ reeds or clarinet reeds, or other reeds, and is as old as the history of man.

Examples of such reed structures are found in United States patents No. 15,921 to Briggs, October 21, 1856; No. 177,610 to Arno, May 23, 1876; and No. 344,443 to Gally, June 29, 1886.

That reed principle has been used and applied to automobile horns and horns operated by suction from the intake manifolds, as exemplified in British patent No. 18,145, A. D. 1909, to Lionel Smith, and United States patent No. 961,158, to Pierson, June 14, 1910.

There is another origin for the art found in the hydrostatic paradox of Clement-Desormes, which originated about 1826.

The hydrostatic paradox is a surprising phenomenon, which was discovered by Clement and Desormes, Frenchmen, about the year 1826, and is briefly described as follows:

When you place a disc over an aperture and blow air through the aperture against the disc, you would naturally assume that the disc would fly away from the aperture until it escapes the moving force of the current, but that is not what happens. On the contrary, when you force a current of air against a disc which covers an aperture, the disc moves away for a limited distance from the aperture, determined by the balance between hydrostatic and hydrokinetic energy, where it stops and begins to flutter, and will remain unseated and in a state of flutter.

The defendant's structure operates on that principle, and the movement of the air current is from the center to the periphery of the closure.

This is illustrated in United States patent No. 1,080,098 to Blake, December 2, 1913, German patent No. 231,085 to Rover, February 16, 1911, British patent No. 16,594, A. D. 1912, to Aigner, British patent No. 17,233, A. D. 1914, to Aigner, British Patent No. 17,234, A. D. 1914, to Aigner and another, and an article, The Technology of Submarine Sounding Devices, by Aigner, Berlin, 1922.

The Aigner patents applied primarily to submarine signaling devices, but which the patentee stated could be used with gas for any sounding device.

In British patent No. 17,234, A. D. 1914, Aigner modified his structure by making both the closure and the aperture resilient, but he attaches the closure member, which is flexible, to the aperture or disc member in such a way as to make it vibrate. He says that, when he sounded these devices, he found that the

apertured disc member also vibrated, to overcome which he provided a nozzle separated from the apertured disc member.

The Aigner article above recited showed a sounding device of which the closure member was resilient but mounted on a rigid stem.

There is another origin of a pneumatic sounding device, in which a closure vibrates in an aperture by pressure, as exemplified in United States patent No. 212,157, to Shaw, February 11, 1879.

In the other branches of the art that do not take their origin from Clement-Desormes, the movement of the air current from high to low pressure is from the periphery in the closure to the center.

In the branch illustrated by United States patent No. 1,281,877, to Teste & Malivert, October 15, 1918, and French patent No. 471,242, July 4, 1913, French patent No. 19,183, First Supplement to patent No. 471,242 to Teste & Malivert, main patent July 4, 1913, Supplemental November 4, 1914, and French patent No. 473,617, to Chollet, January 15, 1915, and United States patent No. 1,391,367, to Chollet, September 20, 1921, the closure is on the high pressure side, and in the first Teste & Malivert patent it was presumably carried or pressed or mounted.

In the later patent to Teste & Malivert both the closure member and the aperture member were resilient, which comprehends both spring pressed or spring mounted.

The Garrett patent in suit, No. 1,434,655, follows after these patents and differs from them only in the manner in which the resiliency of the closure was obtained, that is, in providing a resilient disc closure mounted on a rigid stem.

In the other branch of the art which is found in the French patent No. 18,680, published May 30, 1914, Second Supplement to French patent No. 455,428, taken out March 11, 1913, to Chollet, there is a closure member attached to the apertured member by a resilient spring, a feature common to the other Garrett patent in suit, No. 1,391,887, which has a double closure, both carried by springs attached to the diaphragm, and also to the other Garrett patent No. 1,434,657, alleged in the complaint but withdrawn from this suit, which has a single closure attached to the diaphragm near its periphery by two springs.

Plaintiff's insistence that Garratt was the first to produce a warning signal of the type here in question, in which the inlet opening was larger than the outlet opening, seems to me to have been shown to be immaterial by Defendant's Exhibit O. O., but in any event the prior art patents to Shaw, Pierson, Chollet, and Teste & Malivert all show just such a relation between their inlet and outlet openings, and while these patents disclose structures intended for operation by air pressure, Garratt in both of the patents in suit states that his structures may be so operated.

From the examination of the prior art, I am convinced that, if the construction of the claims of the patents in suit be broad enough to include the defendant's structure, then they would be invalid over the prior art.

In the defendant's structure there is a different assembly of elements from that shown in either of the patents in suit, which elements, both individually and collectively, function in an entirely different manner to produce a new result.

Sound is produced in both of the patents in suit chiefly by the hammer and anvil action of a flexible diaphragm against a valve closure.

The defendant's horn, on the contrary, will function in the same manner without a diaphragm, and the diaphragm although present is merely an effective expedient for maintaining the horn in a clean and operative condition.

In the horns of the patents in suit the valve closures are located on the high pressure side of the diaphragm and outside of the low pressure chamber, and the diaphragm moves toward the closure to effect a sealing of the parts.

In the defendant's horn, on the contrary, the valve closure is located on the low pressure side of the diaphragm, within the low pressure chamber, and at the conclusion of the sounding operation the closure moves toward the diaphragm to effect a sealing of the parts.

This is much more than a mere change of position of an element, as by reason of the change of position there is a change of function, and sound is produced in a different manner, in that during the entire sounding operation the closure in defendant's horn remains entirely off its seat and away from the diaphragm, where it flutters under the influence of the hereinbefore described phenomena, the hydro-dynamic paradox, thus producing sound by rapid variation in the flow of the column of air entering the horn trumpet.

In the first patent in suit, the valve closure or seat is immovable, but, being a thin disc of metal, has some resiliency, the only movement which occurs being that of the diaphragm away from and back to position with respect to this seat.

In the second patent in suit, the valve closure is supported or mounted on a flat strip spring which tends to keep the valve closure in position against the diaphragm, on the high pressure side.

This is not so in the defendant's horn, as therein the valve closure is rigidly carried by a stem which rides in a bearing. The stem is encircled by a helical spring, which presses the closure toward the closed position on the low pressure side of the diaphragm.

The functioning of the horns of the patents in suit and defendant's horn is the result of a differential of pressure on either side of the diaphragm and valve closure, and it is immaterial whether such differential be the result of more than atmospheric pressure against atmospheric pressure, more than atmospheric pressure against less than atmospheric pressure, or atmospheric pressure against less than atmospheric pressure, but a differential of pressure must exist.

As I have hereinbefore shown, the horns of the patent in suit and the defendant's horn have a different origin, as shown by the prior art.

The plaintiff's contention that the defendant's horn does not operate in accordance with the teachings of the hydro-dynamic paradox, and that throughout the sounding operation the defendant's valve is constantly seated and reseated against the diaphragm opening is not sustained.

There is no probative value to the electrical sound test and the Daisy horn exhibits of the plaintiff. The diaphragms of the defendant's horn would have a condenser action as to electrical current passed through it. Even though the valve remained entirely off its seat, the gap through which current would have to pass would be so small that a spark or other visible evidence would not be present.

Plaintiff's expert said that the wear of the modulating discs behind the valve closure in the Daisy exhibit, which had not touched anything during the sounding operation, was nothing more than metal fatigue. I therefore do not attach any importance to the wear of the diaphragms in that exhibit, as it seems to me that it may be properly assigned to the same cause, metal fatigue, or as there is no evidence as to the length of time the horns were in use, or the extent of the usage, it may have been caused by the impact of the closure against the diaphragm at the end of each cycle of operation, or it could have been caused without any impact of one member with another, by the slight vibration of the diaphragm during the sounding of the horn, coupled with the abrasive action of dust or dirt particles during their flexing.

We now come to the question of infringement, and will first consider in their order claims 1, 2, 3, and 4 of patent No. 1,434,655, on which this suit is based.

Claim 1 reads as follows: "1. The combination with the intake manifold of an internal combustion engine, comprising a chamber, a resiliently mounted valve in the chamber adapted to open and close for production of sound, and connection from the said manifold to the said sounding device for operating the valve, said connection having a smaller passage therethrough than in the exposed area of the valve when open."

The defendant's horn has no resiliently mounted valve. The valve closure is a rigid brass disc secured to the end of a valve stem, which is slidingly supported by a bearing member in the rear casing of the horn. The closure is additionally pressed against the aperture in the diaphragms by means of a helical spring encircling the valve stem, but this spring pressed pressure is merely to effect a seal between the parts, and does not in any sense mount the valve.

The structure disclosed by the patent in suit does depend for sound upon a rapid opening and closing of the valve and the hammering of metal against metal.

The defendant's valve does not close for the production of sound, on the contrary it remains open throughout the entire sounding operation.

This was clearly shown in the sounding of Defendant's Exhibit I, the closure of which is formed of rubber, so that sound from impact is impossible, yet the character of sound is the same, and it also was proved by defendant's Exhibit F that the sound is produced by the valve closure or disc while visibly off its seat.

Even if it did intermittently close, it would not be for the production of sound.

While as I have said, I believe the relationship between the area of the connection from the intake manifold and the exposed area of the valve when open is immaterial,

yet, if it is in any sense material, it must be one that exists in operation.

The fact that in the defendant's commercial horn the cross sectional area of the suction tube is smaller than the exposed area of the valve, when open to its physical limits, does not show that such relationship of the parts exists in operation, and I am convinced that defendant's expert is correct when he says that in operation the valve closure opens but a small fraction of the distance that it is capable of opening, and that the area of the suction connection is greater than the exposed area of the open valve.

Therefore, the defendant's horn does not have a smaller passage through the connection from the manifold than in the exposed area of the valve when open.

Claim 2 reads as follows: "2. A sounding device comprising a chamber, a peripherally held disk closing the chamber, said disk having an opening therein intermediate its edges and means against which the sides of said opening abut when the said disk is at rest, and forming a seat therefor and an inlet to said chamber for supplying suction thereto for the purpose described, said inlet being of small diameter in comparison with the disk opening."

In the horn of the patent in suit, as exemplified by the above claim, the seat for the valve is the member 18, which is rigidly mounted against movement, and the apertured disc moves away from and into contact with this seat. Applying the same terms to equivalent parts in the defendant's structure, the stem supported closure member is of necessity the seat, but in defendant's horn it is the closure member which moves away from the diaphragm, which has substantially no movement.

If the claim be applied to the defendant's Supertone horn, it will be found that the seat unseats itself during operation, rather than the diaphragm moving from the seat, as it does in the patent in suit.

What I have said about the comparative size of inlet opening and diaphragm opening with reference to claim 1 need not be repeated, and for the same reasons I hold that this element is not found in defendant's horn.

Claim 3 reads as follows: "3. A sounding device comprising essentially a chamber at least one wall of which embodies a resilient disk, said disk having an opening therein intermediate its edges, a valve formed about said opening and a seat for said valve, and means for forming a partial vacuum in said chamber to unseat said valve."

In the horn of the patent in suit, the disc has secured to its central opening a ring or flange 13, which acts as the movable part of a valve seat in connection with the production of sound, and also serves to some extent as a hammer in connection with the balance of the valve, and the disc.

The defendant has no valve formed about the opening in the resilient disc but simply has an opening in its diaphragm member, which has nothing whatever formed about it, and does not carry any additional member thereon.

No such ring or flange is needed in defendant's horn, which does not, as does the horn of the patent in suit, depend upon the hammer effect in the production of sound.

As I have pointed out with reference to claim 2, the defendant's horn does not have a valve which unseats, according to the meaning of this claim.

Claim 4 reads as follows: "4. A sounding device comprising essentially an air chamber, a resilient disk closing said air chamber, said disk having a central aperture, a valve formed around said aperture, a valve seat comprising a thin disk positioned to normally contact with said valve, and means for varying the normal pressure of air in the air chamber to cause vibration of the valve on the seat, said means embodying an inlet into said air chamber of different size from the outlet."

As I pointed out with reference to claim 3, the diaphragm of the defendant's horn does not carry a flange or ring secured to the central aperture, to function as a valve, within the contemplation of the claim, and has no clashing and hammering of the parts as in the horn of the patent in suit.

There is no thin disc acting as a valve seat in defendant's horn. The element 18 of the patent in suit is the thin disc called for in this claim. This closure member in defendant's horn is a substantial brass disc, without effective resiliency. In the patent in suit the valve vibrates on the seat, while in defendant's horn the closure member moves away from its seat and remains away throughout the entire sounding operation.

As I have hereinbefore stated, I see no materiality in the relative size of the inlet and outlet openings in the chamber in the operation of defendant's horn. From a consideration of the prior art it would appear to be inherent in all horns.

We will now consider claim 4, which is the only claim of patent No. 1,391,887 on which this suit is based, which reads as follows:

"4. In a sounding device, means for peripherally supporting a vibrant disk, means for applying suction behind said disk, said disk having an opening therein, and a closure for said opening adapted to act together with said opening as an air valve, said closure being resiliently carried, so as to modify the vibrations of air passing through said valve."

In defendant's structure the closure is secured to a rigid stem, which in turn rides in a bearing member in the rear casing of the horn. The carriage is a rigid slidable one.

In the structure of the patent in suit, the closure is secured to the end of a flat spring member, which is in turn fastened to the diaphragm and is therefore resiliently carried.

A helical spring encircles the valve stem in defendant's horn and presses the closure against the opening, at the closing of the sounding operation, and in addition to reseating the closure at the end of each sounding operation, also affects the tone of the horn by, in effect, "loading" the closure member.

The defendant's horn differs from the horns of the patent in suit in construction and operates according to different principles of acoustics to produce a different effect.

The language of the claims cannot read on defendant's structure, because to do so they would have to be applied to different elements of defendant's horn than when applied to the horns of the patent in suit.

The defendant does not infringe.

A decree may be entered in favor of the defendant against the plaintiff dismissing the bill of complaint with costs. Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court, as provided by the rules of this court.